United States District Court
Southern District of Texas
ENTERED

FEB 1 0 2003

Michael N. Milby, Clerk of Court
By Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
—BROWNSVILLE DIVISION—

| | |
|---|---|
| CITY OF COMBES, TEXAS, ET AL. § | |
| § | |
| VS. § | CIVIL ACTION NO. B-02-169 |
| § | (Three-Judge Dist. Court) |
| EAST RIO HONDO WATER SUPPLY § | |
| CORP. ET AL. § | |

## MEMORANDUM OPINION

The court has previously entered judgment against plaintiffs' claims under § 5 of the Voting Rights Act. This memorandum opinion explains our decision.

Pursuant to § 5 of the Voting Rights Act of 1965, the City of Combes and its three co-plaintiffs requested that this three-judge district court be convened to decide whether East Rio Hondo Water Supply Corporation ("Corporation") is a political subdivision covered by § 5 and, if so, whether the Board Election scheduled for February 11, 2003, must be enjoined pending the Corporation's submission for preclearance of certain changes in its bylaws pertaining to its electoral procedures. Having obtained full briefing from the parties and a list of relevant, undisputed facts, and having informed the parties that we might consider issuing a summary judgment, we conclude that judgment as a matter of law should be granted for the defendants.

## I. BACKGROUND

We recite here only those facts that are not in dispute. The Corporation is a non-profit water supply corporation which is organized and operates under the provisions of Chapter 67 of the Texas Water Code and the general provisions of the Texas Non-Profit Corporation Act, art. 1396-1.01, et seq., Tex. Rev. Civ. Stat. It is in the business of supplying potable water service to member individuals and corporations and municipalities by contract within an area defined by the Texas Natural Resource Conservation Commission.

The Corporation participates in a financial assistance program administered by the United States Department of Agriculture. As a condition of participation, the Department of Agriculture requires the Corporation to charge a refundable $100 membership fee. Upon payment of this fee, every person (including any legal entity) entitled to service under the bylaws becomes a member of the Corporation. The principal purpose of this fee seems to be to cover the costs associated with connecting and disconnecting the member's property to the Corporation's infrastructure. Additionally, the fee acts as a deposit for delinquent water accounts.

On February 14, 1997, the East Rio Hondo Water Supply Corporation adopted its current bylaws. The Corporation is

governed by a nine-member Board of Directors, elected by and from the membership. These elections are held annually, on the second Tuesday of February. At no time has the Corporation submitted these bylaws for preclearance pursuant to § 5 of the Voting Rights Act.

On September 4, 2002, the plaintiffs initiated a suit, raising claims under §§ 2 and 5 of the Voting Rights Act of 1965 and the 14th, 15th, and 19th Amendments. The § 2 and constitutional claims have been severed and will be heard by a single-judge district court. This three-judge district court considers only the plaintiffs' claims arising under § 5 of the Voting Rights Act.

## II. DISCUSSION

### A. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure allows the court to enter summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

### B. Section 5 of the Voting Rights Act

Section 2 of the Voting Rights Act provides, in pertinent part, that

> [n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.

§ 2(a), codified at 42 U.S.C. § 1973. Criteria for the violation of § 2(a) are laid out in § 2(b).

To guard the rights guaranteed in § 2, Section 5 requires a covered entity to submit any proposed enactment or alteration in the administration of "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" for preclearance to either the Department of Justice or a three-judge federal district court in the District of Columbia. See 42 U.S.C. § 1973c.

The Voting Rights Act authorizes private suits, such as this one. Relief, if granted, takes the form of a stay of the election and the requirement that the defendant seek preclearance of proposed electoral changes from the Department of Justice. Id.

### C. Plaintiffs' Allegations

In support of the plaintiffs' claim that the Corporation violated the Voting Rights Act, they make essentially two allegations. They argue, first, that the Corporation failed to submit the 1997 bylaw changes for preclearance and, second, that the Corporation's 1997 bylaw electoral changes, particularly the

-4-

imposition of the $100 membership fee, have a prejudicial effect upon protected voting rights.

As a threshold requirement for the resolution of both, a plaintiff must demonstrate that the relevant entity is actually covered by the Voting Rights Act. A covered entity is defined in § 2(a) as one of several states (Texas is one of them) or a "political subdivision" thereof. The pertinent question before this court is thus whether the Corporation constitutes a "political subdivision" of the State of Texas for purposes of the Voting Rights Act.

Because this court finds that the Corporation is not such an entity, it accordingly holds (1) that the Corporation need not have submitted its electoral changes for preclearance and (2) that there is no need to decide whether these bylaw changes resulted in the "denial or abridgment" of protected voting rights.[1]

**D. Analysis**

Whether a public utility such as the East Rio Hondo Water Supply Corporation is covered by the Voting Rights Act is primarily a question of federal law. United States v. Sheffield Board of Comm'rs, 435 U.S. 110, 126-28 (1978). Coverage under the Voting Rights Act does not, for obvious reasons, depend exclusively upon

---

[1] This court is powerless to rule on the second claim, because only the federal district court for the District of Columbia has jurisdiction to address it. In any event, such a ruling is unnecessary, as the Corporation is not covered, we here conclude, under the Voting Rights Act.

a state's decision to denominate an entity a "political subdivision" or not. Otherwise states could avoid coverage by delegating decisions regarding electoral policy to entities that state law does not characterize as "political subdivision[s]." See id. at 139 (Powell, J., concurring).

That being said, the Supreme Court's analysis of coverage questions arising under this and related statutes is an exercise in the interpretation of state law. Because the proper mode of analysis, the Court held in Sheffield, 435 U.S. at 126-28, is functional rather than definitional, federal courts should examine how, precisely, the entity at question is treated — rather than merely defined — in the context of the pertinent state's law of intergovernmental relations. The most illustrative case of this sort is Salyer Land Co. v. Tulare Lake Basin Water Storage District, 410 U.S. 719 (1973). In considering a suit brought under 42 U.S.C. § 1983, the Supreme Court held that the voting scheme of a water storage district organized under the California Water Code did not run afoul of the Equal Protection Clause, because, "although vested with some typical governmental powers," it possessed "relatively limited authority" and provided "no other general public services such as schools, housing, transportation, utilities, roads, or anything else of the type ordinarily financed by a municipal body." Salyer, 410 U.S. at 728-29.

### (1) Water Supply Corporations Are Not "Political Subdivisions" Under Texas Law, Whether Viewed Definitionally or Functionally

In support of the proposition that Water Supply Corporations are "political subdivision[s]" under Texas law, the plaintiffs present three bodies of Texas statutory law: the Tax Code, Chapter 11; the Water Code, Chapters 15 through 17 and 67; and the Government Code, Chapters 551 and 552.

This court is not persuaded that any of these three bodies of Texas law provide a definition of "political subdivision" that would encompass, for purposes of the Voting Rights Act, a water supply corporation.

The Tax Code exempts property owned by a "political subdivision of the state" from taxation "if the property is used for public purposes." § 11.11. In contrast, the chapter that specifically discusses the status of water supply corporations in no manner refers to them as "political subdivision[s]." § 11.30.

The Government Code also fails to define utilities as "political subdivision[s]." Instead, the two clauses cited by the plaintiffs, Chapters 551 and 552, both explicitly distinguish "political subdivision[s]" from "nonprofit corporation[s] organized under Chapter 67." In the Open Government Act, Chapter 551, the term "[g]overnmental body" is defined to include a broad range of entities. § 551.001(3)(A)-(J). Subchapter (D) identifies one of

these as "a deliberative body that has rulemaking or quasi-judicial power and is classified as a department, agency, or political subdivision of a county or municipality"; a separate subchapter, (J), includes water supply corporations. The same definitional structure can be found in the Open Meetings Act. § 552.003(1)(A). This court acknowledges that, for the purposes of the Texas Open Government and Open Meetings Acts, a water supply corporation is a "governmental body." The texts of the statutes leave, however, no room for doubt that such a corporation is <u>not</u> a "political subdivision."

Although the Water Code, at first glance, appears to lend support to the plaintiffs' argument, it does not, in the end, advance their Voting Rights Act claim. Plaintiffs' argument is plausible because the Water Code, in at least six passages, defines "political subdivision" to encompass water supply corporations. In two places Chapter 15 ("Texas Water Assistance Program") defines "political subdivision" to include "water supply corporation[s] created and operating under Chapter 67." §§ 15.001(5); 15.602(9). Subchapter 15.901 defines a "political subdivision" as, <u>inter alia</u>, "a groundwater district," <u>id.</u> at 15.901(1)(G), and Subchapter § 15.952 defines a "political subdivision" to include "a nonprofit water supply or sewer service corporation." <u>Id.</u> at (4)(A). Chapters 16 ("Provisions Generally Applicable to Water

-8-

Development") and 17 ("Public Funding") define "political subdivision" to include "any nonprofit water supply corporation created and operating under Chapter 67." § 16.001(7); § 17.001(6).

Nonetheless, plaintiffs' argument fails because in each passage where the Water Code defines "political subdivision" to include water supply corporations, the statutory language itself explicitly limits the definition to very narrow purposes. Thus, Chapter 15's definition of "political subdivision," which includes "any nonprofit water supply corporation created and operating under Chapter 67," is preceded by the phrase: "In this chapter: . . . ." The definitions of "political subdivision" in subsequent passages are similarly constrained by the phrase "In this subchapter: . . . ." §§ 15.602, 15.901, 15.952. The definitions in Chapters 16 and 17 follow an identical pattern. §§ 16.001, 16.313, 17.001. It simply cannot be said that the definitions found in the Texas Water Code provide a basis for regarding water supply corporations as "political subdivision[s]" for anything other than the narrow purposes set forth in the Code.

The plaintiffs' assertions also fail to survive a functional analysis. This can be seen most clearly in the structure of the relationship between water supply corporations and political subdivisions in Chapter 67 ("Nonprofit Water Supply or Sewer Service Corporations") of the Texas Water Code. Rather than

equate the two, Chapter 67 explicitly demarcates their respective purposes and functions: The water supply corporation provides; the political subdivision receives.

> Purpose of Corporation
>     A corporation may be organized under this chapter to provide:
>         (1) water supply, sewer service, or both for a municipality, a private corporation, an individual, or a military camp or base; and
>         (2) flood control and a drainage system for a political subdivision, private corporation, or another person.

§ 67.002. This structure — that water supply corporations are distinct from "political subdivision[s]" and that they exist to serve them — is replicated in many other subchapters of the Water Code. See, e.g., § 67.009 (Facilities); § 67.010 (Power to Contract with Other Entities); § 67.0105 (Contract for Water for Fire Suppression); § 67.011 (Powers of Corporations in Certain Counties).

While it is, of course, true that a municipality may engage in the provision of water services, a water supply corporation created under Chapter 67 is given a single task: providing water to "political subdivision[s]" et al. Regardless of a municipality's residual powers, there can be no doubting the clear distinction that Chapter 67 establishes between "political subdivision[s]" and water supply corporations. They are not the

same. This chapter of the Water Code, taken as a whole, simply cannot be read as the plaintiffs suggest.

Not only has the Texas Legislature articulated the limited purpose and auxiliary status of water service corporations, but a similar conception can also be found in pronouncements from both the Texas judiciary and executive. In the only case to address the question, a Texas Court of Appeals held that a corporation formed for the purpose of combating salt water and sewer problems of municipalities is not a political subdivision of the state. <u>Tarrant County Water Supply Corp. v. Hurst-Euless-Bedford Independent School Dist.</u>, 391 S.W.2d 162 (Tex. Civ. App.-Fort Worth 1965, (<u>writ ref. n.r.e.</u>). Similar opinions have been expressed by the Attorney General on several occasions. <u>See, e.g.</u>, Op. Atty. Gen. 1995, No. JM-011; Op. Atty. Gen. 1972, No. -1070; Op. Atty. Gen. 1970, No. -693; Op. Atty. Gen. 1941, No. 0-3433.

In light of the clarity of the language and structure of the proffered passages from the Texas Tax, Water, and Government Codes, the unequivocal precedent, and the consistent opinion of the state's Attorney General, this court does not hesitate to conclude that, under Texas law, a water supply corporation is not a "political subdivision" for purposes of the Voting Rights Act.

**(2) Federal Case Law Supplies No Basis for a Contrary Interpretation of the Status of Water Supply Corporations under Texas Law**

This court is similarly unconvinced that federal case law provides a basis for regarding water supply corporations such as the one at bar as "political subdivisions" for purposes of the Voting Rights Act.

Few federal courts have had occasion to consider whether the Voting Rights Act covers entities such as the East Rio Hondo Water Supply Corporation. The plaintiffs present to this tribunal three cases which, they argue, sustain their claim: Smith v. Salt River Project Agricultural Improvement and Power Dist., 109 F.3d 586 (9th Cir. 1997); Moore v. Caledonia Natural Gas Dist., 890 F. Supp. 547 (N.D. Miss. 1995); and State of Texas v. U.S.A., 866 F. Supp. 20 (D.D.C. 1994). After careful consideration of these cases and their holdings, this court concludes that they do not.

The two district court cases the plaintiffs adduce are irrelevant to the question before this court, because the trial courts never considered the coverage issue. In Moore the court assumed, up front and without discussion, that the Caledonia Natural Gas District was "a valid political subdivision of the State of Mississippi with the power to sue and be sued," and then proceeded to find the plaintiff's § 5 claims "without merit and insubstantial." Moore, 890 F. Supp. at 548. In the other case,

State of Texas, the court gave no consideration to the possibility that the Voting Rights Act might not cover public utilities, because, it appears, "Texas concede[d] that section 1.41 of S.B. 1477, which abolishes the [Edwards Underground Water District] is covered by Section 5." 866 F. Supp. at 24 n.8. This court declines the plaintiffs' invitation to grant precedential status to litigants' waivers of important federal prerogatives.

The most persuasive authority for the plaintiffs' argument is Smith, in which the Ninth Circuit Court of Appeals explicitly considered and accepted African-American litigants' contention that the Salt River Project Agricultural Improvement and Power District was subject to the Voting Rights Act's requirements. 109 F.3d 586. We conclude, however, that Smith can and should be distinguished from the case at bar. Our reasons for this are two-fold.

First, there did not seem to be any dispute regarding Arizona law's definition of public utilities as "political subdivisions" of the state. "'Under Arizona law, the District is a 'public, political, taxing subdivision of the state, and a municipal corporation.' A.R.S. § 48-2302." Smith, 109 F.3d at 593. Moreover, all parties to the case appeared to agree: "The parties stipulated that, pursuant to § 48-2302, the district is 'an entity vested with all the rights, privileges and benefits granted to

-13-

municipal corporations.'" Smith, 109 F.3d at 593. In the case at bar, by contrast, the pertinent Texas law does not define water supply corporations as "political subdivisions."

Second, the Arizona Power District had far more robust political powers than does the East Rio Hondo Water Supply Corporation. The Arizona Power District, the Ninth Circuit noted, "exercises many governmental powers, including the power of eminent domain, the power to levy taxes on lands within its boundaries, and the power to issue tax-exempt bonds." Id. at 593 (citations omitted). In addition, the Power District "conducts elections according to statutory procedures." Id. at 594. With the exception of eminent domain, Tex. Water Code, § 49.222, the East Rio Hondo Water Supply Corporation exercises none of these powers.[2]

The primary concern of the Ninth Circuit — that enjoyment of "the powers and privileges of the political subdivision" demands fulfillment of "the duties and obligations of a political subdivision" — is simply not implicated by the very nearly apolitical status of water supply corporations in Texas. Id.

---

[2] While it is true that the Texas Water Code establishes several general rules for elections, §§ 67.005-007, the elaboration of electoral procedure is to be found, rather, in the water supply corporation's bylaws. These rules, it is important to note, are not found in the Texas Election Code. The facts in the case at bar are readily distinguishable from the scenario in Smith, where the pertinent Arizona statutes went so far as to prescribe the language of the ballots. A.R.S. § 48-2310. In all important respects, Texas law does not treat water corporation elections as a matter of municipal politics.

### III. CONCLUSION

Because Texas law does not regard — in either definition or function — water supply corporations as "political subdivisions" of the state, and because federal law supplies no basis for a contrary decision, this court holds that the East Rio Hondo Water Supply Corporation is not subject to the dictates of § 5 of the Voting Rights Act. Summary judgment is granted to the defendants. The plaintiffs' suit to enjoin the corporation's upcoming elections and compel preclearance of its 1997 bylaw revisions is accordingly **DISMISSED WITH PREJUDICE**.

**SIGNED this 10th day of February, 2003.**

_____
Edith H. Jones
United States
Court of Appeals

_____
Hilda Tagle
United States District Court

_____
Andrew Hanen
United States District Court